UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ELIJAH BROWN,                              )
                                           )
              Plaintiff,                   )
                                           )
       vs.                                 )        Case No. 4:03CV00962 AGF
                                           )
JO ANNE B. BARNHART,                       )
Commissioner of Social Security,           )
                                           )
              Defendant.                   )


**<u>MEMORANDUM AND ORDER</u>**

This matter is before the Court[1] for judicial review of the final decision of the

Commissioner of Social Security denying plaintiff Elijah Brown's applications for

disability insurance benefits under Title II of the Social Security Act (SSA), 42 U.S.C.

§§ 401, et seq., and supplemental security income (SSI) under Title XVI of the SSA, <u>id.</u>

§§ 1381, et seq.  For the reasons set forth below, the Commissioner's decision shall be

reversed and remanded for further proceedings.

       Plaintiff, who was born on September 24, 1950, applied for disability insurance

benefits and SSI on February 25, 1997, claiming disability onset in 1993 due to mental

health issues, carpal tunnel syndrome, back problems, asthma, and high blood pressure.

(Tr. at 222, 490).  Plaintiff had previously filed applications for disability benefits, the

latest of which was denied on December 20, 1995, with no judicial review requested.

Thus the issue on the applications relevant to the present case was whether Plaintiff was

---

[1]    The parties have consented to the exercise of authority by the undersigned
United States Magistrate Judge under 28 U.S.C. § 636(c).

disabled at any time after December 20, 1995. These applications were denied initially, and Plaintiff requested a hearing before an Administrative Law Judge (ALJ). Before a hearing took place, Plaintiff filed a new application for SSI on April 8, 1999, alleging essentially the same disabling conditions. (Tr. at 546). This application was also denied initially, and Plaintiff requested a hearing. A consolidated hearing on all applications was held on April 4, 2001, at which only Plaintiff testified. On July 20, 2001, the ALJ issued a decision that Plaintiff could perform his past relevant work as a machine operator and laborer, and accordingly, was not disabled as defined by the SSA. The Appeals Council of the Social Security Administration granted Plaintiff's request for review and remanded the case to the ALJ for a supplemental hearing. Such a hearing was held before a different ALJ on November 27, 2002, at which Plaintiff and a vocational expert (VE) testified. On January 31, 2003, the ALJ issued a decision that Plaintiff was not disabled, and the Appeals Council denied review. Plaintiff has thus exhausted all administrative remedies, and the ALJ's January 31, 2003 decision stands as the final agency action.

## SUMMARY OF ALJ'S FINDINGS

The ALJ summarized his January 31, 2003 findings as follows:

1.  Plaintiff met the nondisability requirements for a period of disability and disability insurance benefits and was insured for benefits through December 31, 1997.

2.  Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability.

3.  Plaintiff had an impairment or a combination of impairments considered severe under the relevant regulations.

4.      These medically determinable impairments did not meet or medically equal one of the impairments listed in 20 C.F.R., Part 404, Appendix 1.[2]

5.      Plaintiff's allegations regarding his limitations were not totally credible.

6.      Plaintiff had the residual functional capacity (RFC) to lift, sit, and/or walk about six hours in an eight-hour day; occasionally climb; frequently balance on the left lower extremity; occasionally balance on the right lower extremity; infrequently stoop; and occasionally kneel, crouch, and crawl. Plaintiff could not use his lower right extremity for repetitive use, had to avoid concentrated exposure to noxious fumes and odors, could not perform work requiring acute visual acuity, and was limited to performing low stress occupations.

7.      Plaintiff was unable to perform his past relevant work as a material handler and machine operator.

8.      Plaintiff was an individual closely approaching advanced age.

9.      Plaintiff had a limited education.

10.     Plaintiff had no transferable skills from any past relevant work.

11.     Plaintiff had the RFC to perform a significant range of light work.

12.     A significant number of jobs existed in the national economy that Plaintiff could perform, including jobs in the St. Louis Metropolitan area, such as a dining room helper, assembler, or janitor.

13.     Plaintiff was not under a disability as defined by the SSA at any time through the date of the ALJ's decision.

(Tr. at 36-38).

Plaintiff argues that the ALJ's decision is not supported by substantial evidence.

Specifically, Plaintiff argues that the ALJ erred in his assessment of Plaintiff's mental

---

[2]      As is the general convention, references to relevant regulatory provisions in the ALJ's decisions, the parties' briefs, and this Memorandum and Order are to those appearing under the SSA's program for disability insurance benefits rather that SSI benefits. The provisions are identical under both programs.

RFC by failing to properly consider certain medical opinion evidence and to insure that the record was properly developed on this issue. Plaintiff further argues that the ALJ failed properly to weigh the evidence of Plaintiff's physical limitations and to properly consider Plaintiff's subjective complaints of symptoms. Finally, Plaintiff argues that the hypothetical question posed by the ALJ to the VE was deficient, and that thus, the response from the VE does not constitute substantial evidence in support of a finding that Plaintiff was not disabled.

## BACKGROUND

### Plaintiff's Work History

Plaintiff was unemployed in 1968, 1971, 1972, 1978, 1979, and 1982, and has not worked since 1993. His earnings between 1973 and 1977 reached a high of approximately $1,500 in 1977 when he worked as a laborer on a railroad. Plaintiff worked for three different companies in 1980 and 1981, earning approximately $1,000 and $600, respectively. From 1983 through 1992, Plaintiff worked as a machine operator and material handler, earning a low of approximately $3,100 to a high of $13,400 annually. (Tr. at 541-44). At this job, Plaintiff worked on machines for rolling, measuring, and cutting material; loaded and unloaded trucks, sometimes using a fork lift; delivered material; and trained people to use the machines. (Tr. at 305-06).

### Medical Record

The record includes early medical reports that were before the ALJ who denied Plaintiff's applications for disability benefits on December 20, 1995. These include two psychological evaluations of Plaintiff from late 1994. On December 7, 1994, Ijaz Jatala,

4

M.D., examined Plaintiff for a disability determination. Plaintiff reported that he began experiencing anxiety and depression after he witnessed his brother being shot to death in 1985. He stated that he quit his job and no longer socialized because he was scared "a lot." Plaintiff reported frequent headaches which he attributed to his blood pressure problems. He also reported that his lower back hurt all the time. Plaintiff's medications at the time were Procardia (for hypertension) and Ibuprofen (for pain). Dr. Jatala diagnosed chronic dysthymia.[3] He opined that Plaintiff was capable of taking care of his own affairs and understanding and following instructions. (Tr. at 738-41). The last two pages of this report as they appear in the record are essentially blank. (Tr. at 742-43). The ALJ describes part of Dr. Jatala's report as follows: "In response to a question inviting the doctor to describe any mental problems that impacted the claimant's ability to perform basic tasks and make decision[s] required for daily living, Dr. Jatala indicated there were none." (Tr. at 31).

The second report on Plaintiff's mental status from late 1994 is a Psychiatric Review Technique form dated December 29, 2004, completed by Cherry Roskam, Ph.D. She determined that Plaintiff had a non-severe affective disorder and dysthymia, resulting in "slight" functional limitations, with no evidence of mental retardation or anxiety related disorders. (Tr. at 819-27).

---

[3] Dysthymic disorder is characterized by chronic depression, but with less severity than major depression. The essential symptom for dysthymic disorder is an almost daily depressed mood for at least two years, but without the necessary criteria for major depression. Low energy, sleep or appetite disturbances, and low self-esteem are usually part of the clinical picture. www.psychologyinfo.com

The record also includes medical reports from St. Louis Regional Medical Center (Regional) from September 1994 through November 1995. (Tr. 333-95). As early as September 19, 1994, Plaintiff was diagnosed with carpal tunnel syndrome. (Tr. at 334). In January 1995, Plaintiff was hospitalized for three days with complaints of shortness of breath which had begun two days earlier. He was diagnosed with chronic obstructive pulmonary disease (COPD),[4] asthma, and hypertension. His hypertension was noted to be well controlled on Procardia XL, and he was treated with Albuterol, Atrovent, and Beclovent (metered-dose inhalers) for his COPD and asthma. (Tr. 361-62). On July 23, 1995, Plaintiff was seen at Regional complaining of right-arm numbness and pain, tingling in his fingers, and pain in his neck. He was diagnosed with right-sided radiculopathy.[5] A CT scan of his cervical spine on August 16, 1995, indicated mild degenerative changes at C3-4 and C4-5, slight narrowing in the lateral recess, and a possible herniated disc at C7-T-1. An MRI performed on August 25, 1995, indicated that the cervical spinal cord appeared unremarkable with no evidence of nerve root impingement. (Tr. at 344-54).

The first medical record from the post-December 20, 1995 period is dated April 3, 1997, when Plaintiff was seen by Dennis Brooks, M.D., at Forest Park Medical Clinic complaining of back pain, weakness and numbness in his right upper extremity, asthma, hypertension, right knee pain, and panic attacks. Plaintiff reported that he felt something pop in his lower back in 1992 when lifting heavy material and had experienced

---

[4]    COPD is a lung disease in which the lung is damaged, making it hard to breathe. Cigarette smoking is the most common cause of COPD. www.nhlbi.nih.gov

[5]    Cervical radiculopathy is a problem that results when a nerve in the neck is irritated as it leaves the spinal cord. www.spineuniversity.com

progressive low back pain since that time. He was taking Tylenol for pain and Amitriptyline (an antidepressant). Plaintiff estimated that he could walk one block, sit for 30 minutes, stand for 15 to 20 minutes, lift ten to 15 pounds, and climb seven to eight steps. He stated that he spent his days at home watching television and doing odd jobs for the people in his building. Plaintiff reported a history of asthma, but stated that it was controlled with inhalers. He reported a history of hypertension since 1994 and stated that he smoked half a pack of cigarettes a day. (Tr. at 396-97).

Dr. Brooks believed that Plaintiff had poorly-controlled hypertension, well-controlled asthma, cervical radiculopathy, and low back spasms. Dr. Brooks noted that Plaintiff's right knee was swollen and warm, which Dr. Brooks suspected was due to an inflammatory and/or arthritic process. Dr. Brooks believed Plaintiff could do a moderate amount of sitting, standing, and walking; and light lifting. He opined that Plaintiff's ability to handle objects and fine finger and gross control were intact. Plaintiff's complaints of panic attacks were referred to psychiatry. (Tr. at 398-99). X rays of Plaintiff's lumbar spine and right knee were normal. (Tr. at 401-02).

Also on April 3, 1997, Forest Park Medical Clinic psychologist Daniel Bode, Ed.D., conducted a psychological evaluation of Plaintiff. Plaintiff described his primary physical problems (pain in his arms, hands, and back, and asthma) and reported that he had not abused alcohol in four years. He also reported that he had been in prison 20 years earlier for three years for a burglary charge and had also been on probation for possession of marijuana. (Tr. 405-06).

Dr. Bode noted that Plaintiff's stream of speech and mental activity were within normal limits. Plaintiff's mood and affect were sad, and he reported that he experienced depression and anxiety about two times per month. Dr. Bode did not discern any significant thought or perceptual disorder, while noting that Plaintiff reported hearing a whisper that suggested to him, "What's the use?" An IQ test indicated that Plaintiff had a verbal IQ of 76 (borderline), a performance IQ of 84 (low average), and a full scale IQ of 79 (low average), scores which Dr. Bode felt were consistent with Plaintiff's interview behavior. Dr. Bode diagnosed Plaintiff with dysthymic disorder with anxiety, carpal tunnel syndrome, back injury, asthma, and difficulty bending the right knee. Dr. Bode believed that Plaintiff was able to relate to others with some difficulty, understand and follow simple instructions, and maintain the attention to perform simple work tasks. Dr. Bode also believed that it was doubtful that Plaintiff could withstand the stress and pressures of a regular job due to Plaintiff's self-reported fatigue, and that Plaintiff was competent at the time to manage his funds. (Tr. at 406-08).

On April 15, 1997, a non-examining medical consultant completed a physical RFC assessment, opining in checkbox form that the medical records he reviewed indicated that Plaintiff could occasionally lift and/or carry 20 pounds occasionally, lift and/or carry ten pounds frequently, and stand and/or walk and sit for about six hours in an eight-hour work day; that Plaintiff's ability to push and/or pull repetitively was limited in his lower extremities; that Plaintiff could not frequently balance or kneel, and could only occasionally kneel, crouch, or crawl; and that Plaintiff had no manipulative limitations (including reaching overhead), no visual limitations except for far acuity, no

8

communicative limitations, and no environmental restrictions except for concentrated exposure to hazards such as machinery and heights. (Tr. at 423-28).

Plaintiff was seen at St. Louis ConnectCare on October 24, 1997, complaining of back pain and asthma. He was diagnosed with COPD, uncontrolled hypertension, and low back pain of a muscular nature. (Tr. at 429-30). Plaintiff returned to ConnectCare on February 23, 1998, complaining of elbow and shoulder pain. The physician he saw diagnosed him with hypertension, noting that Plaintiff reported that he was not taking his hypertension medications because he did not have any money. (Tr. at 433-34).

On February 24, 1998, Plaintiff went to the emergency room complaining of left shoulder and arm pain, so severe that it kept him awake, and diaphoretic (increased perspiration) all night. Plaintiff was diagnosed with cervical osteoarthritis. (Tr. at 439). X rays of Plaintiff's cervical spine and chest indicated moderate degenerative joint disease in the cervical spine and mild COPD. (Tr. at 440-41).

Plaintiff was again seen at ConnectCare on March 2, 1998. The doctor noted that Plaintiff needed better control of his hypertension and prescribed a medication. (Tr. at 442). When Plaintiff returned for follow-up on March 25, 1998, he complained of numbness in his left hand, shoulder pain, and soreness in his feet, and reported that his pain medication was not working. The doctor noted that Plaintiff's hypertension was controlled, and diagnosed Plaintiff with COPD, anxiety disorder, low back pain - fibromyalgia, and degenerative joint disease of the cervical spine. (Tr. at 444). At an eye exam on September 18, 1998, Plaintiff was diagnosed with esotropia (an inward turning of

the eyes), hyperopia (farsightedness), and presbyopia (blurred vision at near points) and was given a prescription for eyeglasses. (Tr. at 594).

Plaintiff returned to ConnectCare on September 28, 1998, complaining of pain in his right knee, left toe, feet, back, and neck. Plaintiff stated he was out of blood pressure medication. (Tr. at 595-97). On October 22, 1998, Plaintiff visited ConnectCare for a follow-up podiatry appointment. The doctor noted decreased range of motion of Plaintiff's left toe and pain with palpitation and dorsiflexion. Plaintiff's limited treatment options in light of his lack of insurance were discussed with him. He declined a steroid/anesthetic injection. (Tr. at 598). At a November 18, 1998 routine visit to ConnectCare, chronically uncontrolled hypertension was noted. (Tr. at 600). Plaintiff was seen at ConnectCare on April 15, 1999, for abdominal cramping and loss of appetite, and on May 4, 1999, for neck and back pain. (Tr. at 601-03).

On May 28, 1999, an examining consulting physician completed a disability report in which he diagnosed Plaintiff with moderately severe degenerative joint disease. The doctor opined in checkbox form that Plaintiff had a mental and/or physical disability which prevented him from engaging in gainful activity for which his age, training, experience, or education qualified him, and that the incapacity was expected to last 12 or more months. (Tr. at 636-37).

On June 14, 1999, Warren Lonergan, M.D., of Forest Park Medical Clinic, examined Plaintiff. Plaintiff complained of hypertension, stress, shortness of breath, and disc problems in his back. Plaintiff's medications included Cyclobenzaprine (for pain), Procardia XL (for hypertension), Indomethacin (for arthritic pain), inhalers (for COPD),

and sleeping pills. Plaintiff reported that he smoked a pack of cigarettes a day. On physical examination, Plaintiff's blood pressure was 140/90 with a regular pulse of 80. Plaintiff had a full range of motion of his back without any tenderness or muscle spasms. Straight leg raising, musculoskeletal examination, muscle strength in all major muscle groups, hand grip strength, and gait were all normal.

Dr. Lonergan stated that his examination indicated that Plaintiff did not have hypertension that day, and that there was no history of any end-organ damage as a result of hypertension. Dr. Lonergan opined that what Plaintiff described as stress might actually be anxiety reactions, for which Dr. Lonergan recommended a psychiatric evaluation. Dr. Lonergan found no evidence for the cause of Plaintiff's shortness of breath and could not detect any pulmonary or cardiovascular disease. Dr. Lonergan noted that Plaintiff's back appeared completely normal, and he found no evidence of any trouble in the lumbosacral spine. (Tr. at 638-40). An X ray taken on June 15, 1999, showed no active cardiac or pulmonary disease. (Tr. at 644).

Tom Davant Johns, Ph.D., conducted a psychological evaluation of Plaintiff on August 4, 1999. Dr. Johns diagnosed Plaintiff with adjustment disorder with depressed mood, chronic, moderate; alcohol and drug abuse, both in full remission; hypertension; emphysema/asthma; herniated discs and cervical in thoracic spine without surgery; and one fainting episode and occasional dizziness, by Plaintiff's report. He assessed Plaintiff's GAF at 55,[6] and noted that Plaintiff's motivation and prognosis were fair. Dr. Johns

---

[6] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental

opined that Plaintiff might be mildly impaired in his ability to relate to others and understand and follow instructions; unimpaired in his ability to maintain attention required to perform simple, repetitive tasks, but mildly to moderately impaired in his ability to perform more complex ones; moderately impaired in his ability to handle stress associated with work due to his depression; and competent to manage his funds. (Tr. at 647-51). ConnectCare treatment notes from August 1999 are essentially illegible. (Tr. at 611-14).

A Psychiatric Review Technique form was completed on August 26, 1999, by David Bailey, Psy.D., with conclusions similar to Dr. Roskam's December 1994 conclusions. Dr. Bailey noted a non-severe affective disorder, slight functional limitations, and no evidence of mental retardation or anxiety-related disorders. (Tr.652-660). Plaintiff returned to ConnectCare on August 31, 1999, complaining of upper and lower back pain. The doctor noted that Plaintiff had been without his hypertension medication for several days. (Tr. at 614). X rays taken of Plaintiff's lumbar spine on September 9, 1999, were essentially normal. (Tr. at 615).

A physical RFC assessment dated September 14, 1999, completed by a consulting physician, was less restrictive than the April 1997 RFC assessment. The consultant indicated in checkbox form that Plaintiff could lift and/or carry 50 pounds occasionally, lift and/or carry 25 pounds frequently, and stand and/or walk and sit for about six hours in an eight-hour workday; that Plaintiff's ability to push and/or pull repetitively was limited;

---

Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 41 to 50 reflect "serious" impairments in social, occupational, or school functioning; scores of 51-60 indicate "moderate" difficulties in these areas; scores of 61-70 indicate "mild" difficulties.

and that Plaintiff had no postural (balancing, kneeling, crouching, crawling), manipulative, visual, or environmental limitations at all. (Tr. at 662-66).

On January 12, 2000, Plaintiff went to ConnectCare complaining of pain in his neck and shoulder, and trouble sleeping because of the pain. He reported that he smoked half a pack of cigarettes a day and had run out of his medications. Plaintiff was given new prescriptions for his medications and was told to stop smoking. (Tr. at 616-17). Plaintiff returned to ConnectCare on March 22, 2000, complaining of pain in his back, neck, shoulders, and feet. He reported that he had run out of his pain medication, and also of being forgetful often. Plaintiff had high blood pressure (197/106), secondary to non-compliance with his medications. Plaintiff's COPD was noted to be stable. (Tr. at 692-93).

An X ray of Plaintiff's cervical spine on April 17, 2000, showed straightening of the cervical lordosis and degenerative osteoarthritis of the cervical spine. (Tr. at 634). On a visit to ConnectCare on May 25, 2000, Plaintiff complained of increased pain in his lower back, neck, and shoulders. The doctor noted that Plaintiff's blood pressure was high and increased his Procardia. The notes indicate that Plaintiff's COPD was stable, and that he was taking Zoloft for panic attacks. (Tr. at 694-95).

Saul D. Silvermintz, M.D., examined Plaintiff on August 25, 2000. Plaintiff reported that the pain in his back was continual, and that he could only stand for ten or 15 minutes before he had to sit or lie down. He could only walk half a block or so before the pain became intolerable. Plaintiff stated that the pain in his left foot was due to a work injury prior to 1993. A joint in his left big toe was broken, resulting in continued

difficulty in walking and standing. Plaintiff reported that he experienced shortness of breath after walking one-half block, exacerbated by heat. Plaintiff reported that his hypertension was under control. He stated that he was under stress due to where he lived, stating that it was hot and that he had to walk up to his 11th floor apartment a couple of times a week because the elevators broke down periodically. Plaintiff reported he smoked half a pack of cigarettes a day, down from one pack. (Tr. at 671-72).

On physical examination, Dr. Silvermintz noted that Plaintiff was in no acute distress or discomfort. His lungs were clear and there was no wheezing. Plaintiff's upper extremities were normal, but with motion limitation of his right shoulder. Dr. Silvermintz diagnosed Plaintiff with controlled hypertension with no end organ damage, asymptomatic asthma, history of lumbar disc, history of cervical disc with cervical radiculopathy down the right arm, degenerative joint disease of the right shoulder, probable degenerative joint disease of the left big toe, and stress due to environment. (Tr. at 672-74). X rays of Plaintiff's right shoulder indicated that Plaintiff had mild degenerative changes. (Tr. at 677).

On September 12, 2000, Thomas A. Cuevas, a non-examining medical consultant (internist), completed a Physical RFC Assessment of Plaintiff covering the period of January 1, 1998, to the date of the report. According to Dr. Cuevas, the record essentially showed that Plaintiff's back was normal; that Plaintiff's pain responded to medication; that no evidence existed to support Plaintiff's allegations of asthma, such as findings of wheezing or episodes of acute onset of shortness of breath; that Plaintiff's hypertension was controlled with regular use of medication and avoidance of alcohol; and that his

COPD appeared stable with the use of inhalers. Dr. Cuevas believed that Plaintiff's statement in the record that he could only walk one-half block was not credible because it was not compatible with his report that he occasionally had to climbs 11 flights of stairs to his apartment. Dr. Cuevas opined that Plaintiff should be restricted from performing overhead work because imaging studies showed mild degenerative joint disease of the shoulder. (Tr. at 681-83).

In checklist form, Dr. Cuevas indicated that Plaintiff could lift and/or carry 20 pounds occasionally; lift and/or carry ten pounds frequently; stand and/or walk and sit for about six hours in an eight-hour workday; could not do work that required reaching above shoulder level; had occasional postural limitations (e.g., climbing, balancing, stooping); had no limitations with gross or fine manipulation; and had some environmental limitations in that he had to avoid concentrated exposure to extreme cold, heat, humidity, and fumes as this may worsen his shortness of breath (dyspnea). (Tr. at 684-88).

**Evidentiary Hearing of April 4, 2001**

At the April 4, 2001 hearing, Plaintiff, then 50 years old, testified that he lived alone and had two children under 18 years of age, both residing with their mothers. Plaintiff testified that he had a tenth grade education, and that he had worked as a machine operator for approximately ten years, with other brief employment attempts elsewhere afterwards. Plaintiff testified that he could not continue working because he had too much pain in his lower back, shoulders, arms, hands, and left foot. He testified that he could barely walk at times if he did not have his pain pills. (Tr. at 854-58).[7]

_____

[7] Citation is to the complete transcript of the hearing, which appears in the record as a separate document.

Plaintiff testified that the pain in his lower back allowed him to stand for 15 to 20 minutes at a time, that he could walk three or four blocks at a time, and that he could lift a gallon of milk, two gallons if not for very long. He testified that he could raise his arms up to shoulder level, but that this caused pain in his shoulder and down through his thumbs. He testified that he could take care of his personal needs, like shaving and brushing his teeth, but that it was painful. Plaintiff testified that he had been told that surgery would be beneficial on his hands, but that he could not get the surgery because Medicaid did not cover it. He was told that his shoulder pain was caused by a slipped disc in his neck pressing on nerves leading to his shoulders and arms, and that he had three slipped discs in his back. He testified that he was "constantly in some pain at all times," and that he used prescription pain pills to deal with it. He testified that his left foot was injured when he dropped a weight on it while working as a machine operator/material handler. His foot hurt him all the time, and the pain pills did not always take the pain away. (Tr. at 858-62).

Plaintiff testified that he regularly took Nifedipine for his high blood pressure, but that it was still high. He would know it was high when he would see "rainbows" in his peripheral vision and feel faint and lightheaded. He stated that he had an appointment to speak with a psychiatrist at Hopewell Center the following day for depression. He never before seen a psychiatrist for therapy or treatment. (Tr. at 863-64).

Plaintiff testified that he had never had a driver's license. His typical day consisted of taking his medications, and if he was not needed to watch his grandchildren "or something," watching movies, and going to the senior center next door to "hang out

with some of the fellows over there." Plaintiff testified that he cleaned his apartment sometimes, but would often stop due to pain. One of his children took him to the store and helped him with shopping, unless he just needed a loaf of bread, milk, or "something like that." He also testified that he did his own laundry and cooking. Lastly, Plaintiff testified that when he first started using his asthma medication it did him some good, but that he would get short of breath when he sometimes had to climb 11 flights of stairs to his apartment because of broken elevators. (Tr. at 864-68).

**Post-hearing Medical Evidence**

Plaintiff was seen at Hopewell Center on April 10, 2001, for an evaluation in connection with this case. Plaintiff lived alone and had no support system. He complained that he could not take care of himself or his children as he once did. He reported having no purpose in life and being depressed -- he was once active but now could not do anything because of his asthma and back problems. Plaintiff stated that he enjoyed walking to the church a short distance from his home to talk with the senior citizens and to perform minor maintenance jobs. Plaintiff stated that he was in minor pain and depressed. The evaluator reported that Plaintiff's mood was depressed and his affect was flat. Plaintiff's recent and remote memory were both good, and he was oriented times three (date, time, and place). (Tr. 453-459).

Sometime before April 26, 2001, Plaintiff's treating physician at Hopewell Center diagnosed recurrent major depression and assessed a GAF of 50. (Tr. at 449). The progress notes from April 26, 2001, are completely illegible. (Tr. at 449). Progress notes from Hopewell Center dated May 11, 2001, are largely illegible, but they do indicate that

Plaintiff was only oriented times two, and that he was prescribed two antipsychotic drugs, Serzone and Zyprexa. (Tr. at 462).

**ALJ's Decision of July 20, 2001, and Remand by Appeals Council**

The ALJ issued a decision on July 20, 2001, finding that Plaintiff could perform his past relevant work as a machine operator and laborer, and accordingly was not disabled as defined by the SSA. (Tr. 140-45). Upon review, the Appeals Council vacated the decision on February 1, 2002, and remanded the case for further proceedings. The Appeals Council noted that some evidence referenced by the ALJ was not in the record, and that the ALJ's decision did not clearly indicate the basis for the physical RFC he assessed. The Appeals Council found that the evidence that was in the record (nothing after March 25, 1998) regarding Plaintiff's physical condition was too old for a meaningful assessment of Plaintiff's functioning; that the ALJ's decision did not adequately evaluate Plaintiff's mental conditions; and that VE testimony was needed to clarify Plaintiff"s past relevant work and the jobs Plaintiff could perform. The Appeals Council ordered the ALJ to (1) obtain additional evidence, including reports of physical examinations conducted in 1999 and 2000, and updated treatment notes regarding Plaintiff's physical and mental conditions; (2) further evaluate Plaintiff's mental impairments in accordance with the special technique described in 20 C.F.R. § 404.1520a; (3) obtain evidence from a mental health expert to clarify the nature and severity of Plaintiff's impairments; (4) give further consideration to Plaintiff's RFC; and (5) obtain evidence from a VE to clarify the effect of the assessed limitations on Plaintiff's occupational base. (Tr. at 152-54).

**Medical Evidence Following ALJ's July 20, 2001 Decision**

Progress notes from ConnectCare dated September 27, 2001, indicate that Plaintiff's blood pressure was 170/103, and he admitted to being noncompliant with his hypertension medication. Plaintiff reported numbness in two fingers on each hand and musculoskeletal pain. The notes indicate that Plaintiff experienced occasional wheezing. Apparently Plaintiff was not using his inhalers as he should have been, and he was instructed on correct use. Plaintiff was told to return for a follow-up visit in three months. (Tr. at 469-70). Hopewell Center progress notes dated August 30, 2001, state that Plaintiff was still depressed, that he wanted to hurt himself at times, and that he heard voices. (Tr. at 462).

On February 27, 2003, Plaintiff returned to ConnectCare and reported that his COPD was fine unless he got hot. The doctor noted that Plaintiff continued to smoke despite directions to quit. (Tr. 475). On May 21, 2002, a Medical Source Statement of Plaintiff's ability to perform mental work-related activities was completed by a Hopewell Center doctor. The doctor indicated in checklist form that Plaintiff had fair ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently, and maintain attention and concentration; poor ability to understand, remember, and carry out complex job instructions; fair ability to understand, remember, and carry out detailed or simple job instructions; good ability to maintain personal appearance; and fair ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. The doctor stated that Plaintiff's ability was impaired by poorly controlled

anger. "Fair ability" was defined on the form as "ability to function in this area is seriously limited, but not precluded." (Tr. at 446-68).

Plaintiff was seen at ConnectCare on May 23, 2002, complaining of entire body pain. The doctor noted Plaintiff's blood pressure was high, but stated it was because he had not taken his medication for three days. (Tr. at 483). Plaintiff returned to ConnectCare on August 20, 2002, with the same complaint. The doctor noted Plaintiff had not taken his blood pressure medication that morning. (Tr. at 484).

**Evidentiary Hearing of November 27, 2002**

Plaintiff's testimony at the November 27, 2002 supplemental hearing was largely consistent with his testimony at the earlier hearing. He stated that he left his job in 1992 because he hurt his back, and that his doctor at the time said he had a partial permanent disability. Plaintiff testified that surgery was suggested in 1995 or 1996, but that he was "a little cautious of the surgery" and "kind of paranoid about it." Plaintiff did not specify what the suggested surgery was for. He testified that he survived financially without working because of welfare and food stamps. Plaintiff testified that the Indomethacin he was prescribed for his pain stopped him "from crying a lot," but did not "do the whole job." He did not ask for something stronger because he was afraid he might get addicted to anything stronger. (Tr. at 76-81).

Plaintiff testified that he spent his days watching TV or sleeping-off the effects of his pain medication. He testified that he still attended church about two or three times a month, for about three to four hours at a time, and that he always tried to help out around the church. Plaintiff testified that he would go and visit his children if he could get

transportation. He testified that he had a problem tying his shoes, but not with dressing himself, feeding himself, bathing, washing, combing his hair, or shaving. Plaintiff testified that he went grocery shopping about once a month, when he had a good effect from his pain pills. He washed his own t-shirts and underwear, and a friend helped him out with the rest of his laundry. Plaintiff testified he did not use any assistive device to help him get around. He testified that he got into bed around sunset and watched TV until he fell asleep. Plaintiff testified that he did not sleep longer than an hour at a time before he had to get up for a minute due to his back pain. (Tr. at 80-91, 101).

Plaintiff testified that he was still taking Indomethacin, three pills every morning, and sometimes three more at night, as needed. He was also taking Beclovent, Albuterol, Atrovent, and Ventolin (for his COPD); Nifedipine (for high blood pressure); sleeping pills; and medicine for anxiety and panic. Plaintiff testified that the medicine he took for his panic and anxiety knocked him out, and that he only took it on an as-needed basis. He testified that sometimes his anxiety was triggered by something, but that other times it came on "out of the blue." During his panic attacks he felt his heart pounding, got scared for no reason, felt paranoid and dizzy, and broke into a cold sweat. Plaintiff testified he had stopped going for monthly visits to Hopewell Center at some unspecified point, because he got "upset at the clinic a lot," and now only went to fill his prescriptions. (Tr. 80-94, 97-98).

Plaintiff testified that he could not work because he was in pain all of the time, and could not focus long enough to hold a job. Plaintiff testified that having to stand up or sit down for half an hour increased his pain; reaching or leaning caused pain in his arms

and shoulders; and that his hands ached a lot, as did his knees, particularly if he had been standing up all day. Plaintiff testified he had never received any special education, but had trouble when he was in school and was held back in the third and seventh grades. (Tr. at 94-97).

Plaintiff testified he had been diagnosed with major depression, which kept him from socializing much and from remembering to eat right and groom himself. He testified that sometimes he would have episodes where he did not groom himself for four or five days, that these episodes occurred once or twice a month, that they were better when he was going to Hopewell Center, but that the medication he received from Hopewell Center for these episodes drained him for a day or two. Plaintiff testified that he got sharp little headaches that lasted about five or ten seconds and from which he recovered in about five to ten minutes. (Tr. at 97-101).

At this hearing, a VE testified. She testified that Plaintiff's past work was very heavy and mostly unskilled, with the exception of his duties as a machine operator, which were on the lower end of the semiskilled range. She testified that none of these skills would transfer to lighter-type work. The ALJ posed the following initial hypothetical:

> [I]f we assume a hypothetical individual of [Plaintiff's] age, education, work experience, and assume that person's able to lift 20 pounds occasionally, 10 pounds frequently, and can stand and or walk about six hours in a normal eight hour workday, and sit about six hours in a normal eight hour workday . . . but could not use the right lower extremity for repetitive use of foot controls or pushing or pulling. And that person could only occasionally climb ramps, stairs, ladders, ropes, and scaffolds . . . could balance on the left . . . lower extremity frequently, and on the right only occasionally. Stooping . . . he could perform frequently, and kneeling, crouching and crawling could only be performed occasionally. And that person would have to avoid concentrated exposure to . . . noxious fumes and odors . . . and . . . couldn't perform jobs that require acute visual acuity,

or visual acuity . . . Would the hypothetical individual be able to perform the claimant's past relevant work?

(Tr.106-08).

The VE testified that the hypothetical individual would not be able to perform Plaintiff's past relevant work, but would be able to perform work in the light work category, including work as a dining room helper, assembler, janitor, and order filler, resulting in approximately 40,900 jobs. An additional restriction of "low stress occupations" was added by the ALJ, which the VE testified would eliminate the order-filler position, about half of the assembler positions, and the counter-attendant positions. Work as a dining room helper, a portion of the assembler jobs, and the janitorial work remained. The ALJ then added the restriction that the person would have to alternate sit/stand at maximum 30-minute limits throughout an eight-hour workday. The VE testified that this restriction would eliminate the jobs she had mentioned. (Tr. at 109).

Returning to the first hypothetical, the ALJ altered it slightly to suppose that the individual could stand/walk a maximum of two hours out of a normal eight-hour workday, and lift no more than ten pounds. The VE testified that the individual could perform work within those restrictions at sedentary assembly types of positions or sedentary cashier positions, with about 2,500 such jobs existing in the St. Louis metropolitan area. (Tr. at 109).

The ALJ limited the last hypothetical to simple and repetitive work, which the VE testified would preclude the cashier position, but that the assembler position would remain. Returning to the initial hypothetical posed by the ALJ, he added the same restriction of simple and repetitive work, which the VE testified would permit jobs such as

the dining room helper, a portion of the assembler jobs, and a portion of the janitorial jobs. The VE testified that simple repetitive work was defined as work that "has a few steps, does not require changes in the work process, and is done on a repetitive basis so that the same process is repeated throughout the workday," and is synonymous with unskilled work. (Tr. at 110). When the definition of simple repetitive was altered to include "simple one, two-step instructions," and applied to the first hypothetical posed by the ALJ, the VE testified that the hypothetical individual would be limited to work as a sedentary assembler, approximately 500 positions existing. When an additional restriction of "deficiencies in concentration" and "persistence in pace" was included, the VE testified that this would eliminate those jobs to the extent that the individual was not able to complete the work tasks.

Returning to the hypothetical which included the initial definition of simple repetitive work, and adding the restriction that the hypothetical individual "could not withstand the stresses and pressures of the jobs secondary to fatigue," the VE testified work would be completely eliminated. (Tr. at 111-12). Finally, the restrictions of marked impairment in ability to "follow work rules, relate to coworkers, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently, maintain attention and concentration, understand, remember and carry out even simple job instructions, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability," were added to the hypothetical. The VE testified that such restrictions would eliminate all work. (Tr. at 112).

## ALJ's Decision of January 31, 2003

The ALJ first noted that Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability. (Tr. at 24). The ALJ found that Plaintiff had mild to moderate degenerative changes of the cervical spine, generalized arthritis, borderline to average intellectual functioning, reduced vision, COPD, mild degenerative changes of the right shoulder, and recurrent major depression. The ALJ concluded that these impairments were severe but did not meet or medically equal an impairment listed in the relevant SSA regulations. The ALJ further found that Plaintiff had hypertension which was controlled when Plaintiff was compliant with prescribed medication, and was thus not a severe impairment. (Tr. at 26).

The ALJ specified that Plaintiff's mental impairment did not meet or equal a listed impairment (listings 12.02-12.10 of Appendix 1) because he had, at worst, only mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, and pace if restricted to low-stress jobs; and no episodes of decompensation of extended duration. The ALJ stated that there was no evidence that the Hopewell Center doctor who completed the May 21, 2002 Medical Source Statement indicating that Plaintiff had only "fair" abilities in many work-related activities meant "fair" to indicate "marked limitations," as required by the relevant listings. (Tr. at 26).

The ALJ proceeded to review the medical evidence related to Plaintiff's lower back, left big toe, right knee, hands, neck and arms, right shoulder, hypertension, eyes, and mental limitations, to determine whether Plaintiff had the RFC to perform his past work or

other available work. The ALJ pointed to 1997 X rays indicating that Plaintiff's lumbar spine was essentially normal, and that Plaintiff had full range of motion in his back without tenderness or muscle spasms when examined by Dr. Lonergan in June 1999. The ALJ noted that in August 2000 Plaintiff reported to Dr. Silvermintz that he walked up 11 stories to his apartment at least twice a week. The ALJ believed that Plaintiff's complaints of back pain as documented in the medical record were far from persistent and that positive X-ray findings related to the lower back were nonexistent. (Tr. at 27).

Next, the ALJ noted that Plaintiff's toe condition, namely his inability to flex his left big toe, apparently started well before Plaintiff's alleged onset of disability after he hurt his lower back in 1993, and that it appeared that Plaintiff had been able to work in the past with the toe condition. The ALJ noted that although Plaintiff complained of right knee pain to Dr. Brooks in April 1997, X rays indicated a normal right knee joint, and Plaintiff no longer complained of knee problems when examined by consultative physician Dr. Silvermintz in August 2000. The ALJ also noted that while Plaintiff was diagnosed with carpal tunnel syndrome in November 1994, Plaintiff had full grip strength in both hands, and when examined by Dr. Jatala in December 1994, the doctor indicated no functional limitations associated with the condition. (Tr. at 28).

The ALJ noted that the medical record did not reflect any specific limitations on Plaintiff's ability to grip and perform gross and fine manipulation. Plaintiff's complaints of right shoulder pain were "rare," and between April 1997 and August 2000 Plaintiff, at worst, was found to have limited range of motion in his right shoulder, and only mild degenerative changes. The ALJ discounted Dr. Cuevas's opinion that Plaintiff should be

restricted from performing overhead work, because Dr. Cuevas had not examined Plaintiff, and according to the ALJ, the medical record did not reflect significant continued complaints of right shoulder pain that would warrant such a restriction. The ALJ also discounted the environmental limitations assessed by Dr. Cuevas, as no treating physician noted such restrictions and the record did not reflect significant complaints by Plaintiff of shortness of breath or wheezing. (Tr. at 28-29, 30).

The ALJ noted that Plaintiff's hypertension was controlled when Plaintiff took his medications as prescribed. The ALJ further noted that while X rays in 1995 indicated that Plaintiff had COPD, Plaintiff continued to smoke, contrary to medical advice. The ALJ again noted Plaintiff's report that he climbed 11 flights of stairs to his apartment at least twice a week. The ALJ noted records from 1998 which indicated that Plaintiff had mild COPD, and that while occasional wheezing was noted in September 2001, no inpatient or emergency room treatment was reported after January 1995. With regard to Plaintiff's eyesight, the ALJ concluded that he should be restricted to work which did not require visual acuity. (Tr. at 30).

The ALJ then evaluated the evidence regarding Plaintiff's mental limitations (having previously determined that the evidence did not show a mental impairment that met or equaled a listed impairment). The ALJ acknowledged that IQ testing indicated that Plaintiff had borderline to low-average intellectual functioning, but the ALJ noted that Plaintiff had performed "at least semi-skilled" work in the past. The ALJ noted Dr. Jatala's indication that Plaintiff did not have a mental problem impacting his ability to work and make decisions about daily living. The ALJ stated that while treatment notes in the record

indicated that Plaintiff was sporadically prescribed Zoloft "for some occasional anxiety," he was never advised to seek psychiatric help, and that the notes "either failed to report any symptoms of anxiety or depression, or indicated that the condition was stable with medication." (Tr. at 31).

The ALJ mentioned that while Plaintiff described panic attacks to Dr. Bode in 1997, Plaintiff's greatest emphasis was on his physical impairments. Plaintiff told Dr. Bode that he experienced depression and anxiety about twice a month, but "the treating medical record did not reflect complaints of these symptoms with such a degree of regularity." The ALJ discounted Dr. Bode's opinion that Plaintiff had difficulty relating to others and could not withstand the stress and pressures of a regular job due to fatigue, because there was little in Dr. Bode's examination record to support such limitations, other than Plaintiff's own assertions, and because the opinion appeared to be based upon Plaintiff's physical and not mental condition, which was beyond Dr. Bode's expertise. (Tr. at 31).

The ALJ did not find Dr. Johns' August 1999 diagnosis of adjustment disorder with depressed mood and a GAF of 55 to be fully credible because of the absence of any significant complaints of similar symptoms to treating physicians. The ALJ found that the GAF score of 50 assigned by the Hopewell Center physician in April 2001 was excessive and inconsistent with Plaintiff's described actual daily functioning. The ALJ noted that there was no evidence of prior persistent hallucinations or the need for antipsychotic medication, and that Plaintiff was not referred for inpatient psychiatric treatment, but instead was just seen for treatment sessions at the clinic every three or four months thereafter. The ALJ also noted the fact that the purpose of Plaintiff's visit to Hopewell

Center was to obtain an evaluation for the Social Security hearing, which did not bolster Plaintiff's allegations of persistent mental or emotional symptoms, especially in the absence of similar complaints to treating physicians at ConnectCare where he normally received treatment. (Tr. at 32).

The ALJ then considered the May 21, 2002 Medical Source Statement of ability to do work-related mental activities, which stated that Plaintiff had a "fair" ability to perform several work-related functions. The ALJ stated that the limitations reported in the statement were based upon findings that Plaintiff had poorly controlled anger, whereas the record failed to reflect significant complaints by Plaintiff of poorly controlled anger. The ALJ gave "little weight" to the May 1999 evaluation (in which the doctor opined in checkbox form that Plaintiff had a mental and/or physical disability which prevented him from engaging in gainful activity for which his age, training, experience, or education qualified him, and that the incapacity was expected to last 12 or more months) on the grounds that it was completed by a non-treating physician and was not supported by other medical evidence in the record. The ALJ pointed to Plaintiff's testimony as indicating that he interacted with others at his church. In sum, the ALJ concluded that a restriction precluding Plaintiff from performing more than low-stress jobs adequately addressed Plaintiff's "long term mental impairments." (Tr. at 33).

The ALJ also noted that no specific work-related limitations had been placed on Plaintiff by a treating physician, nor had he undergone inpatient hospitalization, extensive courses of physical therapy, or treatment by a pain specialist. The ALJ pointed out that Plaintiff did not take particularly strong doses of pain medication, and that clinical signs

typically associated with chronic pain had not been consistently present on physical examination. In addition, the ALJ stated that Plaintiff's appearance at the November 27, 2002 hearing "did nothing to add to the weight of the allegations of disability," as the ALJ did not observe "credible signs of motor deficits or serious discomfort during the hearing." (Tr. at 34).

The ALJ believed that the limitations of activities that Plaintiff testified to appeared to be largely a matter of choice, and that no substantial evidence existed to support allegations of nonexertional pain that would significantly diminish Plaintiff's ability to concentrate. The ALJ believed that Plaintiff's ability to watch TV, play games, read, and assist in work at his church all required some level of concentration. The ALJ stated that no lay witness testimony provided significant evidence to support Plaintiff's claims of total disability, and that while Plaintiff complained of some side effects from medications, the medical record did not reflect significant complaints of side effects. The ALJ believed that Plaintiff's history of criminal incarceration "did not enhance the credibility of his testimony." (Tr. at 34).

The ALJ found that Plaintiff had the following RFC: He was limited to lifting ten pounds frequently and 20 pounds occasionally; could sit and/or walk about six hours in an eight-hour day; could not use his lower right extremity for repetitive use of foot controls or for pushing and pulling; could only occasionally climb ramps, stairs, ladders, and scaffolds; could frequently balance on the lower left extremity; and only occasionally kneel, crouch, and crawl; could not frequently stoop; had to avoid exposure to noxious fumes and odors; could not perform work requiring acute visual acuity; and was limited to performing low

stress occupations. (Tr. at 34). The ALJ determined that Plaintiff was unable to perform

his past relevant work, and proceeded to determine whether other jobs existed in the

national economy that Plaintiff could perform. The ALJ noted that Plaintiff's ability to

perform all or substantially all of the requirements of light work was impeded by exertional

and/or non-exertional limitations. Relying on the testimony of the VE, the ALJ concluded

that Plaintiff was capable of performing a significant range of light work that existed in

significant numbers in the national economy, including work as a dining room helper,

assembler, and janitor. In light of Plaintiff's age, education, work experience, and RFC,

application of the Guidelines (Appendix 2, Table No. 2, Rule 202.14) led to a finding of not

disabled. (Tr. at 36).

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of disability benefits, a court must affirm the

Commissioner's decision "so long as it conforms to the law and is supported by substantial

evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005)

(citation omitted). "Substantial evidence is that which a 'reasonable mind might accept as

adequate to support a conclusion,' whereas substantial evidence on the record as a whole

entails 'a more scrutinizing analysis.'" Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175

(8th Cir.1989)). The court's review "'is more than an examination of the record for the

existence of substantial evidence in support of the Commissioner's decision, [the court]

must also take into account whatever in the record fairly detracts from that decision.'" Id.

(quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). Reversal is not

warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.1995)). If after reviewing the record, the court finds that it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the Commissioner's decision. Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001).

In order to qualify for Social Security disability benefits, a person must demonstrate an inability to engage in any substantial gainful activity by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A); Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both the impairment and the inability to engage in substantial gainful employment must last or be expected to last not less than 12 months).

To determine whether a claimant is disabled, the Commissioner employs a five step evaluation process. First, the Commissioner decides whether the claimant is engaged in substantial gainful activity. If so, disability benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, defined in 20 C.F.R. § 404.1520(c) as an impairment which significantly limits an individual's physical or mental ability to do basic work activities. A special technique is used to determine the severity of mental disorders. This technique calls for rating the claimant's degree of limitations in four areas of functioning: activities of daily

living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  Id. § 404.1520a(c)(3).

If the claimant's impairment is not severe, disability benefits are denied.  If the impairment is severe, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in Appendix 1 (20 C.F.R. Pt. 404, Subpt. P).  Mental impairments are listed at 12.01 to 12.10 in Appendix 1.  If the claimant's impairment is equivalent to one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is one that does not meet or equal a listed impairment, the Commissioner asks at step four whether the claimant has the RFC to perform past relevant work.

If the claimant has past relevant work that he can perform, the claimant is not disabled.  If the claimant cannot perform his past relevant work, step five asks whether the claimant has the RFC to perform work in the national economy in view of his age, education, and work experience (vocational factors).  If not, the claimant is declared disabled and is entitled to disability benefits.  20 C.F.R. §§ 404.1520(a)-(f); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003).  The burden is upon the Commissioner at step five to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors.  Ellis v. Barnhart, 392 F.3d 988, 993-94 (8th Cir. 2005).  If a claimant's impairments are exertional and he can perform a full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary), the Commissioner may carry this burden by referring to the Guidelines, which are fact-based

generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment. Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). Where the claimant cannot perform the full range of exertional work due to a nonexertional impairment such as pain or depression, the ALJ must consider testimony of a VE to meet this burden. Id.; Wilcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 1998).

The response of a VE to a hypothetical question that includes all of a claimant's impairments properly accepted as true by the ALJ constitutes substantial evidence to support a conclusion of no disability at step five. Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001) (the hypothetical "must capture the concrete consequences of the claimant's deficiencies"). Here, the ALJ concluded at step three that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment. The ALJ then concluded at step four that Plaintiff was unable to perform his past relevant work. At step five, the ALJ concluded that Plaintiff was capable of performing other work in the economy, and thus was not disabled.

**ALJ's Evaluation of Plaintiff's Mental Impairments**

Plaintiff challenges the ALJ's finding that Plaintiff was limited to simple, repetitive tasks due to his borderline IQ, but had no other mental limitations. Specifically, Plaintiff argues that the ALJ improperly discounted the Hopewell Center treating physician's April 2001 diagnosis of recurrent major depression and GAF score of 50; the Hopewell Center treating physician's May 12, 2002 Medical Source Statement, which indicated that Plaintiff's ability to function in many work-related areas was "fair," defined in the form as

34

"seriously limited"; and the opinions of Dr. Johns and Dr. Bode with regard to Plaintiff's mental limitations. Plaintiff argues that if the ALJ did not know what the Hopewell Center doctor meant by "fair," the ALJ should have contacted the doctor for clarification, in accordance with the ALJ's duty to develop the record. In addition, Plaintiff asserts that the ALJ's decision cannot stand because the ALJ did not follow the Appeals Council's directive to obtain evidence from a mental health expert to clarify the nature and severity of Plaintiff's mental impairments. In a related argument, Plaintiff argues that the VE's answer to the ALJ's hypothetical questions did not constitute substantial evidence that Plaintiff was not disabled, because the questions did not capture the extent of Plaintiff's mental impairments.

In evaluating medical opinion evidence, the ALJ is to consider the examining relationship, the treatment relationship, the supportability, the consistency of the medical opinion, and the specialization of the medical source. 20 C.F.R. § 404.1527. An ALJ is to give controlling weight to a treating source's opinion if it "is well-supported by medically acceptable clinical laboratory diagnostic techniques and not inconsistent with other substantial evidence" in the record. Id. § 416.927(d)(2); Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005). A treating physician's opinion, however, does not automatically control, since the record must be evaluated as a whole, and the ALJ may discount or even disregard the opinion of a treating physician where other medical assessments "are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Reed v. Barnhart, 399 F.3d 917, 920-921 (8th Cir. 2005) (citation omitted). An ALJ is to give

controlling weight to a treating source's opinion if it "is well-supported by medically acceptable clinical laboratory diagnostic techniques and not inconsistent with other substantial evidence" in the record.  Id. § 416.927(d)(2); Tellez, 403 F.3d at 956.

Here, it does not appear that the ALJ fully followed the Appeal's Council's directions on remand.  For example, the ALJ did not obtain evidence from a mental health expert.  This failure, while troubling, would not in and of itself warrant reversal by this Court.  The Appeal's Council chose not to enforce its previous directives when it denied Plaintiff's request for review of the ALJ's January 31, 2002 decision.   Nevertheless, the Court does not believe that the record as a whole supports the ALJ's conclusion that a restriction precluding Plaintiff from performing more than low stress jobs adequately addressed Plaintiff's mental impairments.  Although the ALJ found a reason to separately discredit each of the psychiatric/psychological reports indicating that Plaintiff's mental impairments were significant -- at least by some point in time -- many of these reports, especially the later ones, are essentially consistent with each other.  To rely on the conclusions of non-examining consultants from 1994 (Dr. Roskam) and 1999 (Dr. Bailey) in the face of the later reports from the Hopewell Center treating physicians is not a fair reading of the record.  "The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole."  Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir. 2003).

The ALJ recognized that the Hopewell Center treating physicians' 2001 and 2002 assessments indicated that Plaintiff's mental impairments were significant and would preclude the kinds of jobs testified to by the VE, if not all work.  Similarly, Dr. Bode's 1997

opinion that Plaintiff's IQ and mood disorder would only permit the performance of simple

tasks, and Dr. Johns' 1999 GAF of 55 are not accounted for by the restriction to low stress

jobs.  The Hopewell Center physician's opinions are not contrary to the record as a whole

with regard to Plaintiff's mental impairments from 2000 onward, and the ALJ has not

provided a sufficient basis for disregarding them.  Accordingly, the case will be remanded

for the ALJ to obtain evidence from a mental health expert on the nature of Plaintiff's

mental impairments, and from a VE on the effect these impairments have on Plaintiff's

ability to engage in substantial gainful activity.  See Reed, 399 F.3d at 921 (remanding case

because ALJ failed to give adequate reasons for discounting opinion of plaintiff's treating

psychiatrist); Lauer v. Apfel, 245 F.3d 700, 706 (8th Cir. 2001) (remanding case because

the hypothetical question posed to the VE did not fully address the claimant's depression

and somatoform disorder where the ALJ's  reasons for discrediting the evidence of these

mental problems were not valid).

**ALJ's Evaluation of Plaintiff's Physical Impairments**

Plaintiff argues that the ALJ failed to properly weigh the evidence of Plaintiff's

physical problems and failed to give legally sufficient reasons for crediting one report over

another.  The one example Plaintiff offers is that the ALJ did not discuss why the "positive"

CT scan from August 1995 was given less credence than the negative MRI from that

month.[8]  Plaintiff argues that therefore, the ALJ's assessment of Plaintiff's physical RFC

cannot be said to be based on substantial evidence.

A disability claimant's RFC "is the most he can still do despite his limitations."  20

C.F.R. § 404.1545(a)(1).  In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc),

the Eighth Circuit defined RFC as "the ability to do the requisite physical acts day in and

day out, in the sometimes competitive and stressful conditions in which real people work in

the real world."  Id. at 1147; see also Forehand v. Barnhart, 364 F.3d 984, 988 (8th Cir.

2004).  The ALJ's determination of an individual's RFC should be "based on all the

evidence in the record, including 'the medical records, observations of treating physicians

and others, and an individual's own description of his limitations.'"  Krogmeier v. Barnhart,

294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th

Cir. 2000)).

Here the Court concludes that the ALJ adequately considered the medical evidence

with regard to Plaintiff's physical impairments.  The ALJ thoroughly reviewed the medical

record.  As the ALJ noted, X rays of Plaintiff's back, neck, and knee were rather

consistently essentially normal, showing only mild or moderate degenerative disease.  The

ALJ also properly considered the fact that none of the physicians who examined Plaintiff

noted or imposed any work-related limitations.  See Raney v. Barnhart, 396 F.3d 1007,

---

[8]    As noted above, a CT scan of Plaintiff's cervical spine on August 16, 1995,
indicated mild degenerative changes at C3-4 and C4-5, slight narrowing in the lateral
recess, and a possible herniated disc at C7-T-1.  An MRI performed on August 25, 1995,
indicated that the cervical spine cord appeared unremarkable with no evidence of nerve
root impingement.  (Tr. at 344-54).

1010 (8th Cir. 2005). While some might find otherwise, the ALJ's physical RFC findings are supported by substantial evidence in the record.

## ALJ's Evaluation of Plaintiff's Credibility

Plaintiff argues that the ALJ improperly discredited Plaintiff's subjective complaints of pain. Plaintiff argues that his ability to perform sporadic light activities does not mean that he is able to perform full-time competitive work. In Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), the Eighth Circuit held that the "absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints." The Court explained that in evaluating a claimant's subjective complaints of symptoms, an ALJ must also consider observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the frequency, duration, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Id.

After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record that caused him to reject the plaintiff's complaints. Baker v. Apfel, 159 F.3d 1140, 1144 (8th Cir. 1998). "The decision of an ALJ who seriously considered, but for good cause expressly discredits a claimant's subjective complaints . . . is not to be disturbed." Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999). "If the ALJ discredits a claimant's credibility and gives a good reason for doing so, [the court] will defer to [his] judgment even if every factor is not discussed in depth." Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001).

Here, the ALJ was aware of the Polaski factors and noted several reasons for discrediting Plaintiff's credibility: the absence of objective medical evidence supporting the degree of physical limitations Plaintiff alleged; the lack of consistent and credible records regarding Plaintiff's mental health problems; Plaintiff's failure to take his blood pressure medications as prescribed; Plaintiff's continued smoking against medical direction; Plaintiff's ability to climb 11 flights of stairs; his regular attendance at church and helping with maintenance tasks there; the absence of physical work-related limitations placed upon Plaintiff by any treating physician; the absence of any inpatient hospitalization (except for the brief hospitalization for asthma in 1995), or referral for extensive physical therapy or treatment by a pain specialist; Plaintiff's failure to take particularly strong doses of pain medication; the absence on physical examination of consistent clinical signs topically associated with chronic pain, such as muscle spasms or inflammatory signs; Plaintiff's daily activities (watching television, playing games, reading, and assisting in work at his church) which required some level of concentration; Plaintiff's appearance at the hearing; the absence in the medical record of significant complaints of side effects from medications; and Plaintiff's history of criminal incarceration.

Certainly many of these factors are supported by the record and are valid factors to take into consideration in evaluating Plaintiff's credibility. An ALJ's personal observation of a claimant's demeanor at the evidentiary hearing is a proper factor for the ALJ to rely upon in assessing the individual's credibility. See Cruse v. Bowen, 867 F.2d 1183, 1186 (8th Cir. 1989) (in making credibility determinations with regard to complaints of pain, the ALJ may consider his observations of a claimant's demeanor and physical appearance).

Plaintiff's daily activities, including assisting with work at his church and the senior center and being able to walk up 11 flights of stairs, were not quite as minimal or sporadic as Plaintiff now argues. Furthermore, the ALJ did not rely exclusively on Plaintiff's daily activities.

The evidence of Plaintiff's noncompliance with the medical regimen for his hypertension support the ALJ's findings in question. See Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) (failure to follow a recommended course of treatment weighs against a claimant's credibility); Brown v. Barnhart, 390 F.3d 535, 540-41 (8th Cir. 2004) (evidence of plaintiff's noncompliance with prescribed treatment for hypertension, where such noncompliance was not justified by lack of ability to afford the medication or by side effects of the medication, supported ALJ's determination that plaintiff was not disabled). Despite evidence that Plaintiff had limited financial resources, the record does not establish that Plaintiff could not comply with his hypertension regimen due to a lack of finances and education; there is no evidence that Plaintiff was ever refused treatment or medications due to an inability to pay.

Similarly, Plaintiff's continued smoking against medical advice supports the ALJ's findings. See Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000) (ALJ properly considered plaintiff's failure to follow doctor's advice to stop smoking in discrediting her subjective complaints); Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997) (impairments that are controllable or amenable to treatment, including certain respiratory problems, do not support a finding of disability and failure to follow a prescribed course of

remedial treatment, including the cessation of smoking, without good reason is grounds for denying an application for benefits).

Plaintiff's statement that he did not take stronger pain medications because he was afraid he might get addicted to them is not supported by the record. In sum, the Court concludes that the ALJ was entitled to discredit the extent of physical symptoms alleged by Plaintiff and to find that Plaintiff's physical limitations did not preclude a significant range of light work.

## CONCLUSION

The ALJ's conclusion that Plaintiff's physical limitations did not preclude substantial gainful activity is supported by substantial evidence. The ALJ's evaluation of Plaintiff's mental impairments is not supported by substantial evidence, and this aspect of the case must be remanded. Upon remand, the ALJ should obtain evidence from a mental health expert on the nature of Plaintiff's mental impairments, and from a VE on the effect these impairments have on Plaintiff's ability to engage in substantial gainful activity.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed and remanded for further proceedings.

Dated on this 3rd day of June, 2005.

_Audrey G. Fleissig_

AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE